Case number 20-5154, Melinckrodt ARD LLC, formerly known as Melinckrodt ARD, Inc., Appellants, versus Seema Verma, in her official capacity as Administrator, Centers for Medicare and Medicaid Services, and Alex M. Azar II, in his official capacity as Secretary, United States Department of Health and Human Services. Ms. Stetson for the Appellants, Mr. Solzman for the Appellees. Good morning, Your Honors, and may it please be good morning. Good morning. My name is Kate Stetson. I represent the Appellant Melinckrodt in this appeal. This appeal involves two diametrically opposed CMS decisions on the same issue. In manufacturer price, which I'll call AMP, for its product, Axar, CMS is now requiring Melinckrodt to change it back, and not just to change it back, but to pay rebates retroactively back to 2013, when the base date was first changed, that total in the hundreds of millions of dollars. There are a couple different legal issues on appeal. The primary one, of course, is whether CMS's subsequent decision was legally justified, either as a substantive matter or a practical or a procedural matter. The other question is whether CMS can permissibly apply that new interpretation retroactively to Melinckrodt, even if it could be justified or has been justified. Our overarching statutory argument is that CMS's current interpretation is clearly foreclosed by the controlling statute, and if this court agrees with us on that, that resolves the analysis for all of the various permutations of the arguments that follow. But even if CMS's interpretation isn't clearly foreclosed, even if CMS has or could conceivably justify its action here, there are still some fundamental problems with applying those actions to Melinckrodt, in this case, in order to work the kind of retroactive liability that Melinckrodt is facing here. If CMS had used the term efficacy supplement instead of type 6 NDA and everything else in the case were the same, would there be a statutory violation? Judge Piller, do you mean if FDA had categorized this as an efficacy supplement? Right, and not use the term type 6 NDA, which I gather is nomenclature that's not in the regulations or the statute. It's just their choice in their manual to talk about this kind of application for a permission to use a new indication. That's right. On the manual point, just briefly, all types of NDAs are essentially administrative types. They're done for FDA's regulatory clarity. You can see that in the description of the various types, the JA 524 to 533. But with respect to your question, I actually think that was the question that was asked and answered in the Ipsen case after it went back to the on remand from this court. And what Ipsen ultimately found was that the drug in that case, because it was a supplement, a supplemental NDA and not an independent NDA, did not warrant a new base state based on that difference. But that difference matters here. And it matters for the reason that CMS said in 2012. But just backing up, just for my clarity as to what the legal bearing is of your argument, if they hadn't referred to this as a type 6 NDA, but only ever referred to it as an efficacy supplement and everything else is the same, the regulations and the law, you wouldn't have an argument, would you? I think we, let me approach it this way. When QuestCorps came into CMS in 2012, asking for relief from what was then its current base state AMP, its argument was based not on the NDA at all. And you can see this from the slides from March 2012 that are in the record at 425 to 444, and the extensive letter that QuestCorps sent at the suggestion of Larry Reed, the director of pharmacy at the time of CMS, which is immediately after those slides. And I refer those to you because it's very important to understand that the acronym NDA doesn't even occur in the slides that QuestCorps presented to CMS. CMS's, QuestCorps' argument at the time was, look, this product, which has been around for decades, the label for which has not been changed in 30 years, that's evident on the face, both of the letter and the slides. This product has undergone a fundamental revision, both in the indications that it is used for. We took 30 off and we added a significant one. We added an orphan drug indication for infantile spasms. We got seven years of marketing exclusivity for infantile spasms. And the label was significantly changed. Those were all the reasons that QuestCorps put in front of CMS in 2012, justifying the change. So Judge Fillard, I'm answering your question that way because that was QuestCorps' proper justification. If it had gone in right now after at least the district court's decision in Ipsen, it might not have an argument today. It certainly thought it had an argument in 2012 based on the significant revisions that were undergone. But the drug here is, I mean, I appreciate what you're saying about the presentation that they made and their position about what was different. But nobody's arguing that it's a different dosage form and strength from the existing Actar with the 1990-based thing, right? It's the same dosage form and strength. Correct. And I think that was something CMS recognized in 2012. The key question, and this is what it says in its letter, that August of is Section 1396, and forgive me, R8C2A, defines the Bay State AMP in part for each single-source or innovator multiple-source drug approved by the FDA before or after October 1, 1990. In accordance with that provision, the Bay State AMP is calculated based on the NDA, which is approved by the FDA, not the National Drug Code. Therefore, given that the recently that was corrected in September, a different NDA from the original product, QuestCorps may set a new Bay State AMP. So it was the existence of the NDA that made a difference under the statute. That NDA, of course, was the new NDA. But this is where the government's and the district court's argument on retroactivity in particular gets so interesting, right? Because the statute doesn't say anything about a distinguishing between or among types of NDAs. The statute says new drug application. The regulation says an original NDA, using the old statutory language, is an NDA other than an ANDA, the generic new drug application. If FDA or CMS on the regulation had wanted to distinguish among types of NDAs, a Type 1 NDA is okay, a Type 6, not so much, Type 9, which is expressly not used for marketing, shouldn't be in the mix. It could have said that in the regulation. All the regulation says is NDA. And for retroactivity purposes, I think that the key question is what should QuestCorps have known when it was looking at that express approval letter in 2012 about the basis for the agency's decision? What it knew was that the agency said because Axar was approved under a new NDA, which it was, Axar is entitled to a new Bay State AMP. So you're arguing not that any time a new indication is accepted, there's a reset for the Bay State average price, but only where a new indication is accepted under a Type 6 NDA? No, I think our statutory argument is a little bit broader than that. Our statutory argument is when the FDA, in its expertise, decides to classify something as a new drug application, approves the application as an NDA, as in this case, by the way, awards it seven years of marketing exclusivity, keyed off of that NDA number, that that has significance for purposes of assigning this as a new single source drug. This was not, Judge Pillard, a new dosage form and CMS didn't think so. CMS thought that this was a new single source drug, as the statute defines single source drug. Now, where the government- Let me interrupt for just a second here, because the statute in, I guess it's C2A that sets forth how to calculate the additional rebate uses the term single source drug. And then C2B, which is headed treatment of subsequently approved drugs, uses the term covered outpatient drug. Is there a difference between single source drug and a covered outpatient drug? And if so, what is that difference? There is no difference. Well, there is a difference in the statute between the two, but for purposes of 2B, the provision that you just recited, the covered outpatient drug there is clearly just a shorthand for everything that's followed from C2A. And I say that for one particular reason. C2B, as you see, directs that certain language in C2A be replaced with other language, depending on when the particular drug at issue was approved by the FDA for marketing. And because C2B expressly refers back to C2A, it's quite natural that all of the description in C2A, the amount of the rebate with respect to each dosage form and strength of a single source drug or an innovator multiple source drug, that's the rebate formula for those drugs that we're talking about in C2. A and B just break it down into different timeframes. So, I don't need to know if it matters. Would I be oversimplifying this if I said, um, under the sub B trigger, ACFAR is not, is not a covered outpatient drug approved after 1990 because it was approved in 1952. Would you be- Am I hopelessly oversimplifying this case? I, I, I think you, I think you may be. I have, but why? Why isn't that right? Because the question about what constitutes a single source drug refers back, of course, to the statutory definition of single source drug, which is back at K7A4, I believe. And what single source drug says, and this is where CMS was actually using as a jumping off point. When it talked about a drug approved under a new NDA by FDA, this is what it was talking about. The term single source drug means a covered outpatient drug. Everyone agrees ACFAR was that, which is produced or distributed under a new drug application approved by the Food and Drug Administration. Um, that, that language is largely replicated in the statute with the additional gloss that for purposes of this definition and the drug rebate program, an original NDA, which used to be that language in the statute, means an NDA other than an ANDA approved by the FDA for marketing, unless a narrow exception applies. And we all agree it doesn't here. So you're reading from the regulation though, with what the last part of what you just said. Yes, I am. So you're not relying exclusively on the statute. You're relying on the statute plus the regulation because of course the 1952 approval was an approval of a new drug application, right? It was. It was also an approval of a new drug application. Yes. But for purposes of the statute, the 2010 approval, which also came with marketing exclusivity for that newly approved indication. It came with a direction that new labeling for marketing of the drug be submitted to the new NDA. That was all under a new NDA as well. And that had, I'm sorry, you said it was exclusivity for the new indication and just, just stepping back and, and trying to appreciate the, the logic of your position as a practical matter. This reset of pricing applies not just to infantile seizures, but all indications for which Actar may be prescribed. Right. So to the extent that it is a different single source drug, it's, I mean, it's, your argument sweeps in the 1952 Actar as well as the, whatever it is, 2012 Actar. It does. And there's a, there's a technical reason for that. And then there's a practical answer to that. But the technical reason for that is that the way that CMS has set up the Medicaid rebate program, drugs are not reimbursed by indication under different base amps. They are reimbursed by state amps. So there's no distinction between prescribing for one indication or another. The practical reason is under the Medicaid program in particular, the majority, if not the vast majority of the prescriptions are of course for infantile spasms because so uses, which tend to be tertiary or last step uses for very hard to treat diseases amount to very low percentages in Medicaid in particular. Is that in the record? No, I don't believe it's in the record. I think it's, I think it's publicly noticed, but we could also supplement with an explanation if you need it. I have a simple question along the lines of, of you'll think it's oversimplifying, but when I read the rebate provision, it provides for a new base state AMP for each dosage form and strength of a single source drug. And here we have a single source drug. It's only made by Mallinckrodt and it's the same dosage form and strength. So just as a common sense, so nothing about that is what's doing the work for you. It's only when you then delve into the definition of single source drug and that's what you're relying on. Same dosage form and strength. And you're just saying, well, yeah, same dosage form and strength, identical drug, but it's a different single source drug because of the operation of the statute. Well, I think, I think because of the operation of statute is, is key that what we've had in our briefing. And I don't think the government disagrees with this as a, as a basic principle. It just disagrees with the application here is that you need a different base state AMP for each distinct single source drug and each distinct dosage form and strength of a single source drug. But I think that follows quite naturally from the statute. And it's certainly backed up by the definition of single source drug. But remember all of this statutory analysis that we're talking about, that's the kind of overarching analysis that I said, if you agree with us, that the statute is clear, then we went across the board. The problem, I think the real fundamental issue that this court has to confront, if it concludes the statute is anything other than clear in our favor is, was it appropriate for CMS to apply its new interpretation retroactively all the way back to 2013? But if it were clear in their favor, we're clear in their favor. And I recognize our position because it's so clear. Why did they ever allow a new base state AMP? That's the, that's the difficulty for them. But if it's clear in their favor, then there's no issue of retroactivity or lack of notice. I mean, in fact, we're confined to just apply it. If it is clear in their favor, and this, you are correct, this is the only argument they have for why retroactivity is appropriate, right? Which is, regardless of what CMS said in 2012, in that letter that was sought by QuestCorps, urged by CMS's directly director of pharmacy, expressly approved the base state change. What CMS said in that letter was so clear. What difference does that make if the statute is clear? In other words, with Judge Pillard's hypothetical, if we think the statute is clear in favor of the agency, that is, that this drug is not entitled to a new base AMP, and that that's clear, what difference does it make what the agency said? The agency has no authority under the statute. To authorize a new base state AMP, period. Oh, I think it makes a great deal of difference what the agency said for purposes of the retroactivity analysis. Because- That's what I'm asking you. But if the statutes, if Congress appropriates $100 million for X, and if the agency administering that statute responds to a request from a grantee and says, you know, we've interpreted X to mean Y, and then later changes its mind, doesn't the grantee have to pay the money back? What difference does it make what the agency said? Congress did not appropriate the money for purposes of Y, period. The agency has no authority under the statute or the Constitution to authorize the expenditure of funds for purposes other than what Congress appropriated them for. So that's the type of hypothetical that the government is urging is applicable here. The government is saying the statute was so clear that the party- Well, that's my question. I was only asking you the same question. Assume it's clear. If it's ambiguous, I think you've got a very powerful case. But stick with my hypothetical. Just let's assume it is clear. Isn't it? Isn't it true that the analysis, it makes no difference what the agency says, because the agency has no authority to allow appropriated funds to be used for a purpose other than that prescribed by Congress? Yes. If you have a black and white statute that says X and the agency interprets it to be Y, then it would naturally follow that no regulation- So this case then turns on whether this statute is ambiguous or unambiguous, correct? Correct. Correct. Because if it's ambiguous, I get you. You have a very strong argument. But so you would agree that if this panel concludes that the statute is unambiguously clear in the agency's favor, then we would affirm the grant of summary judgment. It all turns on the clarity of the statute, correct? And by clarity, I mean you can have a statute that's extremely complex, but nonetheless clear, right? You certainly can. Yes. Right. In fact, that's kind of what we do here at this court. Those are the cases we see. All right. Let me ask you one other question. If we agree that, and again, stick with my hypothetical because I know you don't agree with it, but if we think that the statute is clear in either party's favor, all of the subsidiary arguments fall away. If you're right, none of the other arguments matter. If the government's right, none of our arguments matter. But let me spend some time then if I could- I think we have some debate. So tell us once again, tell us as clearly as you can why you think that  the statute is not clear in the agency's favor. Let me tell it from the perspective of what the government and the district court now argue makes the statute so clear, if I could. What I would really like to hear from you is what in the statute makes it unambiguous about whether this drug is entitled to a new Bay State AMP? From our perspective, what in the statute makes this unambiguous? From our argument's perspective. You mean from the government's unambiguous argument or mine? I think the question was- From the government. You can say both. Yeah, from you. Let me take both in order. Let me take our-  is basically the one I described to you, which I thought- the one that I thought you might think was oversimplified. So why isn't that- tell me why that's not unambiguously required by the statute. Because the statute says absolutely nothing about administrative or different types of NDAs. The government's current argument, and I want to land on that word current for a minute. The government's current argument is that because this particular new drug application was a type six new drug application and in CMS's estimation type six new drug applications are merely administrative and there's nothing that actually happens under them. They have no function, nothing is marketed under them. Remember, by the way, this is the question that FDA, the expert agency, declined to answer. There is nothing in the statute that talks about different types of NDAs. It says when a drug is approved for marketing under an NDA, it's a new single source drug, full stop. Now, the reason I said current interpretation is that I also want this court to understand how much these arguments have evolved, both over the course of this case and over the course of the district court decision and appeal. In the district court, what the district court said and what the government said at the time was that CMS was mistaken, which, by the way, is not a word that appears in the administrative record, mistakenly believed that the FDA had approved the decades-old Axar as a new drug. That was the government's argument below. District court concluded CMS thought in 2012 it was approving an entirely new drug. That can't be, and the government clearly knows it. CMS knew what drug this was, knew how old it was, knew how important it was, knew the value to the Medicaid program of keeping Axar in the program rather than having it leave, because, of course, as Larry Reeves, the CMS Director of Pharmacy, understood, this drug leaves the program. States still pay for it under the early screening and treatment program. Keeping the drug in the program was the real focus of 2012. Now, the government is saying, well, what we really were mistaken about, and, again, mistake is not in the administrative record, were this critical fact about the type 6 NDA, but it wasn't marketed under the NDA. That, again, is nowhere in the statute, and so to agree with the government that the statute is unambiguous, you either have to conclude what the district court did, citing a late 1800s decision, that the statute implicitly contemplates approval of a brand-new drug, an entirely new drug, or you have to agree with the government's current gloss, which is while the statute says NDA, while the regulation, to Judge Wilkins's point, says any NDA other than ANDA, that what it's really talking about are the true NDAs, not the ones that are just kind of administrative, but that simply cannot be found. One of my earlier questions came from, which is, it just leads to a very arbitrary differential treatment of different, otherwise completely analogous decisions accepting new indications. There have been many new indications accepted for ACTHAR that are as important medically and as, you know, supported by new information as this one, but just to put it most tendentiously, because the form of this one, instead of being a, you know, supplemental, an efficacy supplement, it's called a type 6 NDA, which needn't be under the regulations or the statute, but just because it is, then randomly this new indication resets the base date and pace. That just seems really arbitrary and not defensible. That is exactly what CMS concluded in 2012. I think it's completely defensible, both from the statutory and regulatory language perspective we've been talking about, and, Judge Pillard, on the facts. Let me mention a couple of things. The first is, CMS is now... Before you get into it, as a descriptive matter, that's right. Most new indications, when they're accepted, don't trigger a new base date AMP, right? That's correct, but that is because FDA chose, in this case, to assign a new NDA number to this, and it might be helpful if I spend a couple minutes on the type NDA issues, because I think there's something that's important for this Court to note in the Joint Appendix. If you look at Joint Appendix 529 to 530, there's a description of the two types of NDA that essentially took the place of a type 6 NDA, and I'm talking about type 9 and type 10. Type 9 NDAs are expressly deemed not to be marketed under that new type 9 NDA number. The manufacturer intends that the product be marketed under the parent NDA. Type 10 is the opposite. Type 10 is marketed under the type 10 NDA number, and that tends to be applied, as you'll see in the JA at 530, that tends to be applied when there are, among other things, significant labeling revisions. Type 9 and 10 NDAs replace type 6, and you'll remember that there is a back-and-forth also in the Joint Appendix at page 536 to 538, where CMS asks FDA, does this mean that Axar is not marketed under the first NDA, or not marketed under the second NDA? And what FDA, the expert agency, says is the policy on type 6 NDAs is still being deliberated. Come back and ask us in a few months. And I lay all this out because the distinctions among types of NDAs, you'll notice type 8 applies when somebody is just changing a drug from prescription to over-the-counter in a couple different dosages or strengths. The FDA has decided when and how it will alter a drug application to make it a new NDA. Congress decided, and CMS decided, to make the NDA the pivot point for a base state amp. Not a particular type of NDA, but the NDA itself. But the reason I think there's some irony in this judge pillar, just as a practical matter, is CMS's general approach to the definition of NDA, as you can see in the regulation, is to actually make it as broad as possible. An NDA is any ANDA, any NDA other than an ANDA, full stop. And the reason they do that, of course, is because in lots of circumstances, there are NDAs that FDA assigns for different indications, to your point, a change in delivery system from some kind of a powder to an objection. It's the same drug that's delivered in a different way. CMS wants all of those drugs to be considered single-source drugs because the rebate amount is higher for single-source drugs than it is for generic drugs, which a lot of these otherwise would be. So there's some irony here in CMS saying, well, for this particular NDA in this particular case, just because we don't like the direction that this went in, this particular NDA actually is off the table. But more to the point, this entire debate presumes that QuestCorps in 2012, when it sought and then got this letter from CMS saying, you should and can stay in the program, we're changing your Bay State amp, we're changing it because you've got a new drug approval, that that was so worthless that QuestCorps and then Malincroft could not rely on that express guarantee. That's essentially what the government is arguing. And I submit there is simply no way to read that statute or that regulation to support that clear interpretation. Not even the district court could bring itself to say the statute was clear. What the district court ended up having to say is, what is implicit in the statute is as good as what is expressed. And that simply is not the case when it comes to a clear textual command to a regulated entity that is discernible with ascertainable certainty, as this court said in GE, cannot work an unfair surprise. This did all of those things to this which it now says it did, never said in the record. If CMS made a mistake, why is Malincroft on the hook for footing a bill for hundreds of millions of dollars for the agency's mistake? That I think... Ms. Stetson, thank you. We've taken you well over your time. We'll give you a minute or two on rebuttal. Let's hear from the agency. Thank you, Your Honor, and may it please the court, Joshua Salzman on behalf of the defendants. I'll just dive right in. I don't think the court should be afraid of oversimplifying the statutory analysis here. The statute is straightforward as applied to this set of facts. I think there are two different paths you can get to the right result, but the easier and more straightforward one is one that I think Judge Tatel put forward most cleanly, which is to just look at provision C2A and C2B together. If you look at C2A, it sets a default rule. That default rule, which applies to all drugs that were then existing when the statute was adopted in 1990, is that the Bay State AMP is based on the third quarter of 1990. Axar existed in 1990. Everybody now agrees there's only one Axar. Initially in this litigation, they contended that Axar was actually two drugs, though if you look at the opening pages of their brief now, they describe Axar as an old drug that got a new approval. Everybody agrees that Axar should have been covered under C2A. Then the question is, do we get out from C2A under C2B? Because that's the only way out. C2B is titled Subsequently Approved Drugs and applies to covered outpatient drugs approved by FDA after October of 1990. Now, FDA approved indications and labeling changes for Axar after 1990. I think Judge Pillard's line of questioning about supplemental NDAs and efficacy supplements was squarely on point here and got to the heart of the matter, which is what happened in 2010 was an approval of an efficacy supplement of a new indication, but it wasn't approval of the underlying drug. Therefore, without even resorting to look to the definition of single source drug, you can resolve this case solely on the basis of C2. But what is a covered outpatient drug and how is a covered outpatient drug different than a single source drug? Sure, Your Honor. So, the definition of covered outpatient drug, you can find this on page 41 of the addendum, is subsection K2. The definition is a little lengthy, but I think the relevant provision for our purposes here would be a, I'm reading from K2Ai. It's a drug that's approved for safety and effectiveness as a prescription drug under Section 505 or 507 of the Federal Food Drug and Cosmetic Act. Now, what happened in 2010 wasn't approval of the underlying drug as safe and effective. The FDA had done that 50 years or 60 years earlier. What they did was they this infantile spasms indication. And you can see that if you look at the approval they eventually got from FDA, this is, I'm reading the last page of the, or I direct you to the last page of that approval letter, which is JA411. But if you look at the entire letter, it's devoted only to this infantile spasms indication, not to reevaluating the drug as a whole. And that letter on JA411 culminates in FDA instructing QuestCorps that all of the active maintenance you need to do for maintaining a drug, there's periodic reporting requirements and other things you need to do as you continue to be regulated by FDA. All of that should be addressed to the original NDA, 008372 for this drug product, not to this NDA. In the future, do not make submissions to this NDA, except for the final printed labeling. And just in case there was any concern about what QuestCorps understood at the time, I think if nothing else, all of their concerns about being misled by the agency are largely rebutted by the document at JA414, which is something that was central to the district court's opinion. And yet Malincroft can't even bring itself to acknowledge this document in its briefing here. This is the letter, this is the rather the submission that Malincroft made to the FDA to associate the new indication, the infantile spasms indication with the parent FDA. And at that time I'm reading from JA414, it says QuestCorps is submitting something in reference to NDA 08372, that's the old one, that's the original 1952 for HPXR gel and tracking NDA 22432, that's the type six, for the supplemental NDA. They were calling it a supplemental NDA for treatment of infantile spasms. They then call it an efficacy supplement and go on to repeatedly refer to it as a tracking NDA number that will no longer be used. So QuestCorps was very aware in 2011 of exactly what FDA had approved and had not approved in 2010. And the source of their authority from FDA to market this product going forward, and that source was the original parent NDA, the 1952 NDA. So that is what makes this case so clear under the statute. When the FDA approves a new indication, and there's a definition for in the same statute, right? Why isn't that an approval of safety and efficacy? I mean, what in the definition of medically accepted indication excludes it from also being considered an approval of safety and efficacy? So I understood from Ms. Stetson's colloquy with Judge Pillard, and perhaps I misunderstood. I heard her acknowledge and accept the fact that when a supplemental new drug application, for example, is used to process an efficacy supplement, that that is not something that would reset the base state AMP. And with good reason, because the statute is directed to approval of the underlying drug, not the iterative changes that can happen to the label. And that is not all that infrequent of an event. As I think Judge Pillard noted, ACTSAR itself has over the years undergone many labeling changes. There have been many indications that have been added to the label that have been removed from the label over the years with FDA approval. There's a process for that. But none of that is approval of the underlying drug. It doesn't provide the authorization to market the underlying drug, which, of course, has been continuously on the market for 70 years, thanks to that 1952. Well, how did the agency seem to come to the exact opposite conclusion in 2012, then? I'm glad you asked that, Your Honor. First of all, I do think, as Judge Tatel elucidated earlier, you don't even need to get to any of this if you think the statute is clear in our favor. But if you want to look at the 2012 letter, I think it actually underscores the fact that the agency just simply did not understand the true nature of the facts. And in particular, what it did not know in 2012, but subsequently learned in 2015 and 2016, was that this approval had been limited to the limited infantile spasms indication was really just an efficacy supplement. And the way you know that clearly, I'm reading from JA 453, which is the letter, there's a clear distinction drawn in that letter between the, quote, recently approved Axthar gel and the, quote, original product. And I think that that shows that CMS, at the time, did not appreciate that this NDA was for, though denominated an NDA, was, in fact, merely approval of a new indication and not approval of a new underlying drug. To the extent that you have concerns, I'm sorry, Judge Pillard, were you about to ask a question? The difficulty for me in saying that the statute is clear, the statute is clear that only an NDA, a drug that is distributed under an NDA, is going to be the basis for a new date, a new base date, AMP, but the statute doesn't really define NDA. And so the question is, if the statute is clear, and I take this really to be Ms. Stetson's argument, I'll just show, she'll correct me on rebuttal. The statute doesn't define NDA, but says the consequences flow from the issuance of an approval of an NDA. And if the agency, erroneously or not, says this is an NDA, then in what respect is it not the agency's responsibility that it made that error? I want to be clear about which agency we're talking about here, whether you're talking about FDA making an error or CMS making an error, because I don't think either entity erred exactly. But I think you're talking about FDA potentially making an error, and for that I think it's very helpful to look at the administrative record here, starting with what FDA told Mallinckrodt, or at the time it was QuestCorps, up front when it assigned this. Because remember, QuestCorps understood it was just asking for a new indication, so it didn't submit an entire new big NDA packet, it submitted a supplemental NDA. And at the time, in 2008, this is at JA 330, FDA told Mallinckrodt, recognized that because of a quirk of its filing system at the time, there were going to be issues routing submissions related to this efficacy supplement to the proper unit within FDA, because the underlying file, the active file that approved the underlying drug, was under the purview of the metabolic folks, and this efficacy supplement related to infantile spasms needed to be routed to the neurology people. Now, FDA subsequently solved this when they adopted a new system called DARTS in July of 2009. But a year before that, they hadn't adopted this new approach yet, they didn't have that solution, so they assigned a new number for administrative purposes. And they were very clear in that 2008 correspondence with QuestCorps that we're assigning a new number for administrative purposes. And then, when they approved it finally in 2010, there's that language from JA 411 that I was quoting, that they said, don't use this number anymore. This isn't your number, all of your reporting, all of your obligations tied to the underlying drug itself are associated with and are supposed to be completed with under the original NDA number. And as I said, QuestCorps was not in any way confused by that, as indicated by that letter at JA 414 that I was reading earlier. So, against that backdrop... So, if the FDA had at that point said, it's okay with us to use your new number and to market the drug when it's used for this indication under the new number, if those were the facts, would you win or would you lose? I'd need to know a little more. If there was... If FDA had approved this as essentially a new drug product and then was continuing to administer and authorize its distribution under that new NDA, then I think probably the base aid AMP would be reset. But I don't think it would be on an indication by indication basis. I think it would have to be that there was a new drug product. Drugs are not approved and evaluated for... Okay, fair point. But I guess my point is, did the FDA have the discretion to assign it a new NDA number at that point and allow it to be marketed under a new NDA number? I don't know specifically what the... There's nothing in the record addressing the specific criteria that FDA uses. I would say that if you were assigning an entirely new drug application, treating this as an entirely new NDA as opposed to an efficacy supplement, there are several criteria Malincourt would have had to satisfy or QuestCorps would have had to satisfy as to what would go into that application to make it a new NDA that were not satisfied here precisely because QuestCorps understood this to be just an efficacy supplement. So, there are lots But the reason I'm asking these questions is that your friend on the other side talked about JA 529 to 530 and the fact that the FDA under certain circumstances now does assign a new NDA number and allow the drug to be marketed under that number. So, since statute doesn't define new drug application, can the agency effectively then just either, depending upon how they arbitrarily assign new drug application numbers or by regulation, just basically change when a drug that was previously approved gets a new base date AAP? So, there's nothing... This is the first time at oral argument that they've made the argument about type 9 and type 10 NDAs. So, I apologize. I'm not in a position to address what established criteria FDA may have for determining whether something should be categorized as a type 9 or type 10. But I think returning to the type 6 issue here, which is I think what's central is the fact that Malincroft or QuestCorps was notified at the time that it was just an administrative tracking number and the fact that this was put in just as an efficacy supplement and maybe there's another circumstance. Yes, Judge Chato? No, you finish your sentence and then you finish. I'm just getting ready to ask you a follow-up question. Okay. I think I got the core of the point I was hoping to get out. So, I'm happy for follow-up. I was wondering whether your response to Judge Wilkins would have been in the definition of a single source drug, which is a covered outpatient drug must be produced or distributed under an NDA to qualify. And even if the type 6 NDA is an NDA, this drug was not produced or distributed under it. It was produced and distributed under the 52 NDA. That's absolutely right, Your Honor. But why is that the argument? Why wasn't that your answer? Perhaps it should have been, Your Honor. You're certainly right that that is the other way to resolve this case in our favor. As I said, there are two statutory paths and I agree that that second one is, I think, I hope responsive to Judge Wilkins' concern. Either you just get there by saying that it's not a new covered out, a subsequently approved covered outpatient drug for purposes of C2B, or you look at the definition of single source drug in K7 that Your Honor was just referring to and look at the requirement that it be produced and distributed. At the point that FDA authorizes this as a new drug and is administering and providing the authorization to produce and distribute and market that drug under a new NDA number, then I think under the statute, you would say that the applicable NDA is a new one. Is your position... Go ahead. No, you go ahead. I was going to change the subject. I was just going to say whether it's the agency's position that they could have and perhaps should have identified instead of referring to a type 6 NDA, they could have just said efficacy supplement dash N and that would have routed it to the, what is it, the neurology review entity. Could have done that. Yes, I think that happened not to be their practice. I don't know how their computer systems were set up at the time. I believe there might have been just sort of a need to have an underlying NDA number to be associated with the file, but the file at issue here is just the file for the efficacy supplement. It's not the file for the underlying NDA that is charged with, that is the file under which the drug itself is being administered. The file associated with the type 6 NDA, you're saying, is only, is limited to the file that supports the IS indication. Yes, that's right, Your Honor. That the only, because you wanted to carve off a piece to give over from the endocrine, the metabolic and endocrine folks over to the neurology folks, I believe as a function of how their computer system and their filing system was set up at the time, they needed to have a overarching number to associate with it in the neurology, at the neurology end of things, so they assigned the type 6 NDA. But presumably it cross-references everything in the original NDA and, I mean, they would say, then they did say in their brief, Mallinckrodt said in their brief that of course it's produced or distributed under the type 6 NDA because it couldn't be produced and distributed in response to infantile seizures unless it had that approval. It ends up feeling like the agency is just saying, well, because we told you to close that, it's very formalistic. We said we're not going to refer to that anymore, but you needed that in order to market it the way you're marketing it. And then they said, actually, we are going to reset your base date AMP. So it's a little hard to say the statute is clear where the agency has all this wiggle room about how it labels things, and those labels have major statutory consequences for it to say, well, it's clear that when we labeled this in a way that would have major statutory consequences, we never meant that. So a few things, Your Honor, that I'd like to unpack there. One is the question of whether this idea, well, they couldn't market it for that specific indication but for the approval they received under the 2010 type 6 NDA. And that point proves too much because that's equally true of any efficacy supplement approved under a supplemental NDA. The indication, to be sure, needed to be approved by FDA. But that's a supplemental NDA, not an NDA. Well, this was an NDA number, and it was certainly an NDA number that was used in processing this, but it was always described to QuestCorps as being used for administrative purposes only. At the time that it was closed out, they were told that if you look at the letter itself, it's not reviewing all of the underlying drug or purporting to reconsider whether the drug itself is safe and effective writ large. It's only analyzing the efficacy supplement. And then it's saying we're closing this out and go back to using your original NDA. And if you're concerned about what FDA was saying later on and their confusion, if you look at JA 522, this is a 2015 correspondence from FDA back to CMS. This is when CMS had started questioning whether the right base data AMP was being used. You have FDA writing to CMS, the only active NDA for HPXR gel is 008372, the 1952 NDA. And again, that's not a surprise. That wouldn't have come as a surprise to QuestCorps because they said the same thing in 2011. So against that backdrop, I think the statute can be plainly applied according to its words, either by recognizing that ACTHAR the drug, not the infantile spasms indication, but ACTHAR the drug was not a subsequently approved drug. And also the authorization for the production and distribution of the drug itself flowed from the 1952 NDA. I'm trying to understand, something can be both a single source drug and a covered outpatient drug, right? A single source drug is a type of covered outpatient drug. So in the definition of single source drug, it refers to it as a type of covered outpatient drug. That's what I thought. So, I mean, earlier you said, well, here, the statute, a clear and simple application of the statute is to say that this, using the definition of single source drug, that when we look at the language which is produced or distributed under a new drug application approved by the Food and Drug Administration, in that sense, this particular one in your view was not approved under a new drug application in 2012. So it's not a single source drug. But that doesn't necessarily mean that it couldn't be a covered outpatient drug, does it? It doesn't necessarily, inherently, the subset of covered outpatient drugs is larger than single source drugs. But there is no circumstance under which ACTHAR would be like a multiple source drug or anything else. And I don't think Ms. Stetson will argue otherwise. So you're saying that it can't be a covered outpatient drug, just looking at the definition, because the only one of those that could possibly apply to it is in AROMANET 1. And that doesn't apply because its safety and effectiveness wasn't approved by the FDA in 2012, only a new indication. Yeah, I think that's mostly right. To be clear, ACTHAR is a single source drug. It's just one single source drug that was approved in 1952. Their argument is that ACTHAR, they're a little cagey about this, but they say ACTHAR became a distinct single source drug afterwards. And that's where we take issue. There is one ACTHAR. It's an old drug that received its approval in 1952. And that's the relevant approval for all purposes. Notwithstanding the approval of a supplemental indication, it is not a subsequently approved drug. And that's why it's not within C2B. I'm sorry. Maybe I'm just a little thick here. But the statute where the rubber meets the road is the statute that defines how you calculate the additional rebate. Yes, Your Honor. In that provision, in Part B, for treatment of subsequently approved drugs, talks about what do you do if you have a covered outpatient drug that is approved by the FDA after October 1, 1990. So, saying that this is or isn't a single source drug doesn't necessarily answer that question, right? Yes, I agree with that. It's Ms. Stetson who wants to direct you to the definition of single source drug. I'm very content to have the court only at C2B and to see that C2B is directed to the approval of a drug, not the approval of an indication. Because I think that's sufficient to resolve this case. What was subsequently approved for ACTHAR in 2010 was a new indication. It was an efficacy supplement. It wasn't approval of the underlying drug itself. And that's why we think C2B is why the produced and distributed requirement in K7 means even if you go down that path with her, it's going to lead to the same result. But we are perfectly content for you to resolve this just on the strength of C2B. So, were you done, Robert? Sorry. I have a different line of questions. So, go ahead. Okay. I'll give you a break. Ms. Gisalsman, let's talk about the retroactivity issue for a minute here. And I want to be sure I understand your position here. Am I right that your position is that even if Quest's 2012 letter had been completely forthcoming, and I'm not saying it wasn't or was, but assuming it had been completely forthcoming, and even if the agency's CMS's response hadn't reflected any of the confusion you think is in there, in other words, both of those have happened, your position is that CMS can still recover all of these payments because the statute's clear, right? Clear statutory language trumps whatever the agency says. That's your position, right? That is my position, but I do think that our position is further strengthened by the fact that there was... Well, you're changing my question. I'm trying to get to the bottom of what your position is. Clear statutory language trumps, and I take your point that you don't think they were forthcoming, and I take your point that you was a little cagey itself or had limitations to it, but just stick with my question, which is, if the statutory language is clear, the agency's position is, right, doesn't make any difference what the agency told the regulated party, correct? I think that's right, your honor, both... Why do you say you think... Fair notice. So, there's two things... I'm sorry, your honor, go ahead. I'm surprised with you saying you think that's your position. That's the way I read your brief. Oh. If that's not accurate, then you need to tell me that now. I apologize, your honor. Yes, it is our position that the statutory requirement is fair, or the constitutional requirement, rather, is fair notice, and here, any fair notice was supplied by the plain text of the statute. On top of that... And it makes no difference whether the agency misled the regulated party or not, right? I think that's a fact... They're making two different arguments. They're making a due process argument, and your response to that is, look, the statute's clear. But their other argument is that, and they cite our case for this, is that, look, it's a situation, this is what they say, you don't have to tell me it isn't your position, it's what they say, that, look, the agency misled... The agency told us we could do this. And your answer to that is, makes no difference, right? So, my argument is, it needs to meet the manifest injustice standard laid out in the Quest case. I'm not saying that no case might ever... For the retroactivity... Can you give me an example? I'm curious, we have to write an opinion here, and if we write an opinion which says what you say we should say, namely that plain and clear statutory language trumps whatever the agency says, that will be cited in future cases, and I'm wondering what the limiting principle is to that. Is there a way... Does this apply to all cases, or just to a case like this, and if so, why? So, I think the reasons it's acceptable to limit it, I think you can direct it to the facts here, and I think it's important... We don't write opinions that way. Every opinion contains a holding, which applies to future cases. We can't decide a case based on just these facts. We have to apply a principle to these facts, and your principle is, to repeat myself, clear statutory language trumps agency misleading statements, right? That is our threshold argument. As I said, we also have arguments as to why the facts here, in particular... I understand that. So, then you were going to say to me, and I may have interrupted you, that may not be true in all cases, right? That's what I'm curious to explore with you. Let me just give you a hypothetical, okay? So, suppose Congress enacts... Well, it does have. Congress has one of its housing programs provides vouchers to poor people, right? For housing. Suppose... This is just a hypothetical. Suppose it says the voucher is canceled if the resident runs a business, okay? And it defines a business as a sale of any goods for money. You got the hypothetical? Yes, I do, Your Honor. Okay. Now, a resident comes to the is that okay? They can sell masks. And they say, sure. That's okay. It's just kind of a side thing. Fine. And then a year later, they take another look and they say, no, we can't do this. This is a business. It's selling goods for money. Now, what about that case? Can they collect the back voucher payments? I don't think they... I think under OPM versus Richmond, that's actually a remarkably close analog for the facts of OPM versus Richmond. So, I think under Supreme Court case law that that's actually going to resolve that case. But to the extent Your Honor's concerned with the breadth of the rule, I'd remind you that the relevant standard here is manifest injustice, which I think is inherently something that lends itself to fact-based applications. It's going to necessarily turn to some extent on the circumstances. If the hypothetical I gave you isn't manifest injustice, give me one that would be. Just give me an example of a case that falls on the other side of the line. If you're asking us to write an opinion based on the principle you're offering, I'd like to know what case falls on the other side of the line. Just give me an example. But does it have... But nonetheless, you want it to be... I'm not sure if I can give you an example when there is a limit. I want a case. I want you to give me an example of a case where the statute is clear, the agency has misled the person, yet we would be able to hold that they can't recover back payments. I just need an example. I'm not trying to give you one for the statute. If the statutory language is sufficiently clear that it's providing adequate notice of the rules, and certainly with a sophisticated business party like Mallinckrodt... Wait a minute. Now you've just changed... You've come with maybe sophisticated business. Is that a sophisticated party? Is that the difference? I think, again, that the manifest injustice is... And how do we find that? Like my housing case. The resident is a poor person who has a housing voucher, unsophisticated. Where do you draw the line between Quest and that person? Where is it? I have absolutely no idea. I don't know of any cases that help us define that. Do you see what I'm getting at here? You're being very candid with me about your principle, and I appreciate that. That's very helpful to explain to us what the agency's principle is you're offering. I worry about us incorporating that in a binding opinion of the D.C. Circuit without us understanding what its implications are. I certainly appreciate that concern, Your Honor, and that's why I think the court is aided by the fact that there are other factors you can point to that will... I'm not necessarily asking you to adopt a per se rule here. I think it's appropriate to look to things like the 2011 letter in which Quest Court acknowledged and recognized that the NDA would not be used on a prospective basis and was limited to the efficacy supplement. I think it would be appropriate for the court to look to the sophistication of Mallinckrodt. It would be appropriate to look to the fact that the court isn't... that this isn't the government going out and regulating parties in the market, but rather is merely enforcing statutory and contractual obligations against a voluntary participant in a government program who reaped significant revenues as a result of that participation and is not being asked of any penalty, but is merely being asked to repay the amounts that it took out of Medicaid by raising its prices. So I think you can look to those confluence of facts and use those as being... and treat them as sufficient to recognize there would not... I have a couple of questions to follow up if Judge Tatel... I don't want to interrupt you though. No, I'm done. That's good. I'm finished. Thank you. So in 2012, when Mallinckrodt... when the regulated entity gets the letter from CMS, it's final agency action, right? I'm actually not sure that's true, Your Honor. Under this court's Ibsen case, if the agency had said no and had required them to change the base data AMP, that would be final agency action. I'm actually not sure whether the corollary extends... Well, and that just kind of even makes my questioning a little easier. My question is basically getting at, was there any way for the regulated entity to get a definitive ruling from a court in 2012? There wasn't, was there? Because even if it was final agency action, they wouldn't be injured by anything, so I don't see what standing they would have. So you want us to adopt the rule where a regulated entity... let's assume for the sake of my question that we find that everything that they did was above board, and they go to the agency and they say, look, we're losing money by participating in this. We don't think you want us to opt out of this. Here's what's going on, and the agency comes up with a solution and an interpretation of the statute. They can't go to a court and get some sort of a declaratory judgment, so they're completely at the mercy of the agency as to whether it's ever going to change its mind as to whether it's going to interpret the statute. But it's not like some low-level bureaucrat gave them this interpretation. It was the head of the division of pharmacy, right? That's correct, Your Honor. So when the regulated entity is basically kind of stuck, shouldn't that factor in to how we look at whether it was reasonable for them to rely on this in a due process sense? The concern there is certainly reasonable to take into account, but I do want to emphasize what Mallinckrodt or at the time QuestCorps did not do and why you shouldn't be concerned that this case is the one you're describing. And I want to point out exactly what they didn't do, but before I do that, I want to make sure that the goal posts aren't shifted on us a little bit, because Ms. Stetson's briefing emphasizes or pushes back on the idea that QuestCorps was trying to hoodwink the agency. And the hoodwink standard or the above board standard, I think, isn't the relevant standard here. QuestCorps might have been operating entirely in good faith on the front end when they came to the agency, and indeed, they recognized the real deficiencies in this NDA theory. They didn't even bother to propound it. But because they were writing to a different theory, they didn't put all the critical facts before the agency. And in particular, they didn't say what they told FDA in 2011, which is, we recognize this was approval of an efficacy supplement, not of a true underlying drug, and that the tracking number will no longer be used. So that information wasn't before CMS. Now, QuestCorps might have thought there was a reason to put that before CMS, because that wasn't their theory. But then what happens in 2012? The agency comes back and says, aha, we think we can help you out. Your theories don't make any sense. Your theories we can't adopt. But we have an alternative basis or way of getting there. We can do this because the, quote, recently approved Actar gel was approved under an NDA and is therefore different than the, quote, original product. At that point, there's a blinking red light, and the onus was on QuestCorps to come back to CMS and say, wait a sec, just so we're clear here, here's what that 2010 NDA number was and what it wasn't. And particularly in a situation where the agency had said, we're limiting our determination here to the facts that were before us, and this is not a release of liability, QuestCorps got an answer they liked, and they ran with it, as opposed to fulfilling their obligation at a minimum to confer with the agency and make sure the agency was aware of all of the relevant facts. So I guess my other question is, along these lines, is what if we think that reasonable lawyers and judges could disagree as to whether or not the statute is clear and unambiguous? Does that have any role to play on our retroactivity analysis? Yes, I think it does. I mean, a key piece of our argument as to why it's, if you were going to say the statute doesn't provide adequate fair notice, then I think you'd have to say at what point did QuestCorps get fair notice? Well, first of all, you'd have to see was QuestCorps sufficiently up front with the agency in 2012 that they should even get the benefit of the 2013 to 2016 period. I think there's no concern after April of 2016. We're not talking about that time. We're talking about 2012 to, stick with 2012 to 2016. Just to say, just to some, there's some, Ms. Stetson candidly explained that if the statute's clear, she loses on this period. I hear you explaining to Judge Wilkins that if the statute's ambiguous, you lose on that period, right? No. There's one, we are sort of, if the statute is ambiguous. You're denying me the symmetry I was looking for. I'm sorry to deprive you of that, Your Honor, but if the statute is ambiguous, justice to the 2013 to 2016 period, the relevant analysis is was the QuestCorps, could QuestCorps reasonably rely on that letter in light of the submissions it had made to the agency? If you're going to say the statute didn't provide the fair notice, then it's just a question of was there enough of a blinking red light in that letter that the agency might have misapprehended the relevant facts that it was unreasonable for QuestCorps to rely on that. So that's the other way you can rule in our favor for 2013 to 2016, even if you statute is ambiguous. You would have a point, I think you'd have a point if, I mean, if the Quest letter, 2012 letter, were clearly and plainly deceptive and misleading, I would understand your point, but you really can't say that about the letter. Sure, it could have been more forthcoming, but it wasn't inaccurate in any sense. Sure, it could have been more forthcoming, but it wasn't inaccurate, and the agency's response, you can look at it now and see caveats and things like that in it, but as Judge Wilkins said, I thought he put it really well, what you had here was a company that really, really wanted to keep this drug in the program and an agency that also really, really wanted to keep this drug in the program. And if the statute is ambiguous, it's hard for me to see how the agency can, consistent with principles of due process, require retroactive payment. Well, you're asking me, I think, to assume that we lose our alternative argument. I agree that if you both disagree, but we can prove that the statute's ambiguous, and also that there was not, that it was reasonable for QuestCorps to rely on that notice under the circumstances. I agree for the 2013 to 2016 period, we lose. That said, I want to add one caveat. I'm sorry, Judge, do you have a question? Well, my hypothetical was different. I was actually surprised that Ms. Stetson conceded that if we found that the statute was clear, that she would have no retroactivity argument. Maybe she didn't concede that, but it sounded like she did. My question was, even if we conclude that the statute is clear and in your favor, we can also believe that reasonable lawyers or judges might disagree on that question. That's why they pay lawyers like Ms. Stetson big bucks, because the difference between Chevron Step 1 and Step 2 is not readily apparent all the time to us or the regulated entities, to agencies. So I guess I'm still not sure why it is that even if we ultimately, after wrestling with this, believe that the statute clearly cuts in your favor, that that necessarily means that it was unreasonable for a regulated entity to rely on an authoritative letter from the agency that took the opposite position. If we think that that's a closed question and reasonable people might think that the statute is ambiguous on that point and that the agency was essentially interpreting the statute in a way that made sense for everybody at the time, then maybe they change their mind later, but they can rely on an agency interpreting an ambiguous statute. That's what agencies do every day. So your honor, like you, I understood Ms. Stetson to concede that if the statute is unambiguous, it would supply the requisite fair notice in order for us to prevail. That being said, I think you can also just get there by looking at things in total. You don't have to sort of segment out all of the different pieces of this. One piece is the clarity of the statutory language, but that operates in tandem with the history here. The fact that QuestCorps was unambiguously aware in 2011 that it had only gotten approval of an efficacy supplement, that the plan for this type 10 NDA was going to be, that number was going to be closed. It was not to be used prospectively and the drug itself was to be marketed only under the 1952 NDA. So then you have this correspondence back and forth. And I agree with, I think it was Judge Tatel said before, that nothing in the letter itself was that QuestCorps submitted in 2012 was affirmatively wrong. But that's why I wanted to emphasize before that the Hoodwink standard isn't the relevant standard here. The relevant standard is lower. It's did QuestCorps have a reasonable basis? Could they reasonably rely on that 2012 letter from CMS? And in light of the limited facts that had been put before CMS, the fact that there were key omissions from the No, just moving my arm. I'd like you to finish your list, but then I have a question. Standard language, the history, nothing in the letter pertinently wrong, but things admitted. They couldn't reasonably rely on the 2012 letter more? No, I think that's everything for 2013 to 2016. And after 2016, I think it gets even clearer. But for that three year stretch, that's what I pointed. So I just find, so is your view that CMS made a factual mistake in assenting to Plaintiff's request to reset that base date AMP in 2012? Because Plaintiff's briefing says you're not subscribing to the mistake theory of the district court. I'm not quite sure about their characterization of this. What we would say is CMS issued guidance on the facts that had been put before it and was very upfront that what it was saying was limited to the facts that had been put before it. I think on the facts that had been put before it, arguably CMS may have reached the right conclusion. The problem was it didn't have all the facts. And once it had all the facts in 2015, 2016, that's when it came to the conclusion that it announced in April, 2016, that they were using the wrong base date AMP. Wait, you're talking about the facts before it. I mean, internally, the agency has all the information, does it not? Well, CMS, not FDA. Obviously, they're both subcomponents of HHS. But CMS disclaimed, again, we're talking about how reasonable it was for them to rely on this letter. And at the point that CMS is disclaiming any intent or having done any outside research of having gone to track things down, Ms. Stetson's brief is sort of directed to a world where the agency was on inquiry notice and sort of using that as the relevant standard. And I just don't think that's the right way to think about it. Why not? When you talk about CMS versus FDA versus HHS, to me, that doesn't evoke a clear picture of... Sitting here, I can't even really tell you who made which decisions and why they should know all the information. Sure, Your Honor. So, what we're dealing with here is the Quest Corps came to CMS and said, we'd like some guidance. This wasn't an application according to a formal process that's laid out or governed by statutes or regulations. They came to CMS and said, we'd like some guidance on this. Here's some facts. On those facts, what do you think? And the agency said, we're not going out and doing... This isn't a formal adjudication. We haven't taken the responsibility on ourselves to fully investigate this. We are saying, you've asked for what our views would be on these facts. On these facts, it seems to us like you can reset your base state AMP. Not for the reason you think, but one fact that you mentioned in your filing makes us think you probably can. But our advice here is limited to the facts you've given us, and it's not a release of liability. And Quest Corps takes that. They don't say, oh, wait a sec, there's possible confusion here. Your guidance here might be incorrect, or you might not have considered this additional important information. They just sort of want to, because they like the answer they got, they left it there. And that's where I think the real sin was. And as for... This is totally separate, but in the Medicaid Act in 2019, Congress deletes the word original before new drug application, and the definition is single-source drug. What should we make of that? Yeah, so our view is that that's not relevant here. That was directed to an ambiguity in the statute that isn't about when a base state AMP gets reset. There was some confusion that was resulting about whether a drug was a single-source drug or a different category of drug. It wasn't about the base state AMP. And that's the reason the deletion was made, and that's the reason we haven't... After the fact, it just struck me. Okay. Okay. Anything else to either of my colleagues? So, I'm sorry, Judge Pillard, I had one... I had one question I wanted to just get some clarity on. So, is it your position... Is it your position, Mr. Saltzman, that... Can you hear me? Yes, I can. Can you hear me? I can. We can hear you. I can hear you. Is it your position that... Okay. My internet connection is going in and out, I think. So, is it your position that if an NDA has been previously approved for a drug, then it can never get a new base state AMP for the approval of a new indication, a change in label, even if the FDA allows the drug to be marketed under a new NDA number? Because the statute says that it's whether a drug is approved by the FDA after October 1, 1990, not whether a new indication is approved. So, I think a single drug product can only have its original NDA. Now, if FDA processes an entire new drug application for a chemical compound and recognizes it as a distinct drug... I want you to answer my hypothetical, please. My hypothetical assumes it's the same drug, but a new indication was approved by the FDA, and the FDA gave it a new NDA number for whatever reason, and they said you can market it under that new NDA number. Your position is the same, that there could be no change in the base state AMP? I'm sorry to resist your hypothetical. I'm not quite sure how in the world that... I'm just not aware of any circumstance where that would occur. I think there are situations where it is conceivable that FDA would approve a new NDA for something that had was a previously recognized drug compound and recognized it as a new product. Conceivably, that new product was going to be administered prospectively under a new NDA number, and with the additional indication, that would be entitled to a separate base state AMP. But if it's the same drug product with a new indication added, I don't think there's a under the same NDA number. But I think the relevant question under the statute... My question is, let's suppose, even though you don't believe that that could happen, if it happened, you would say they still wouldn't get a new base state AMP because what the statute says doesn't change, and the statute says it's got to be a drug approved, not a new indication approved. If all that was approved was a new indication, yes, I think that what would be relevant. But I'm afraid, Ben, if I give that answer, I'm fighting your hypothetical that the drug itself has been approved for marketing under the new NDA. That's why I'm struggling a little with your hypothetical. But I think if unless the drug itself is approved under a new NDA, it is not a subsequently approved drug for purposes of C2B. All right. Thank you. That's all I have. Okay. Thank you, Mr. Saltzman. Ms. Stetson, we took you way over. You can have three minutes. Thank you. Thank you, Your Honors. Just a couple of quick points. The first is, Judge Wilkins, I did not concede the thing that you thought I shouldn't have conceded. What I conceded in response to Judge Tatel's line of questioning is that when you have a statute that makes itself perfectly clear that the agency can only do X and the agency does the opposite of X, does Y, if it is so perfectly clear that a regulated entity should never have reasonably relied on that statute, on its face, then you have the kind of blockage to my arguments that I was talking about. What you were talking about, Judge Wilkins, I think is far more common, which is that the statute can be interpreted to lead to a clear result, but that different minds, reasonable minds, can disagree, as they do here, about what that clear result is. Judge Wilkins, the question that you just asked Mr. Saltzman I think is answered by Joint Appendix 530, and that's the Type 10 NDA. Type 10 NDAs, and I'm going to quote here, is for a drug product that is a duplicate of a drug product that is the subject of either a pending or approved NDA, and the applicant intends to market the drug product under the separate Type 10 NDA after approval. Type 10 NDA is normally for a drug product that has a new indication or claim, and it may have labeling or a proprietary name that is distinct from the original NDA. That, of course, is our case, although our case was approved under a Type 6 NDA. I think Type 6 lacks precisely the language that's in the Type 10, and that's critical. That's actually critical to our argument, Judge Pillard, and this leads to a different question that Judge Tatel asked. Judge Tatel, you suggested that one of the things that makes this statute clear is that the statute talks about the drug being produced or distributed under the NDA, and this drug is produced or distributed under the 1952 NDA, and Mr. Saltzman of course said, that is CMS's ipsy dixit. That is exactly the question that is not resolved by what the Type 6 NDA is or is not. This drug was not, quote, produced or distributed under the Type 6 NDA. Judge Tatel, there's actually a very heated debate... That is not correct, Judge Tatel. What we would say is... I can point you to a couple points in the record. The most important is that the statute itself, the governing statute, 21 U.S.C. 355 D, says that an NDA is for marketing approval, so that's your going in presumption, that if something is labeled an NDA, it's for marketing approval, but more to the point, in this case, you have the orphan approval letter, Joint JA 422, that says, as the first sponsor of this drug to obtain marketing approval for this indication, you are entitled to seven years of orphan drug exclusive approval. Marketing approval began, quote, on the date of approval of your NDA 22432. So we can have a very spirited debate about whether something was or was not... The statute says, quote, produced or distributed. It doesn't say marketed. It doesn't say approved. It says produced or distributed. Judge Tatel, the government below, in its brief, in its summary judgment brief at note 14, which is page 19, the government below concedes that produced and distributed and marketed are the same. So for these purposes, while... Well, we have a big problem here with... As you yourself have pointed out, we've got a big problem with the agency's interpretation of the statute pretty much at every level, right? I mean, you know... Yes. And it's one thing that... Because we're looking at the language of the statute, it doesn't really make any difference what FDA said in the district court about it. The language of the statute is clear, produced or distributed. If the agency says it also means marketed, well... Particularly when you're talking about indications, where the whole point is, of course, you can use it for infantile seizures as it was produced and distributed, but you can't market it for that until the indication has been approved. So it's... And it only got orphan drug treatment for that marketing, not for all sales. And I understand you, so it's a factual matter that the infantile seizures was the most important under Medicaid, but you conflate the resetting of the NDA for this indication with the notion that the NDA for the entire drug has been reset. Well, I think for purposes of what the discussion we're having now, which is whether AXAR was marketed at any point for any indication under the new NDA, because of course, the government's position is AXAR has never been marketed under the new NDA. I think it is important that this received the orphan drug approval it did, that it received marketing approval to market for that indication under the NDA. For purposes of the base gate amp, there are statutory consequences that flow from the NDA approval. But on the marketing point, just to round it off, if I could, remember that this is the issue that FDA squarely declined to decide. At Joint Appendix 536, it is asked, will this reflect that the drug is marketed under 8372? And FDA's answer is, we're still the agency that's responsible for this. How can it be clear to the regulated entity? The last point I would make with respect to Mr. Saltzman's argument is a question, Judge Pillard, that you asked about FDA having some wiggle room here. And that's where the really extensive irony of this really lands, right? Because you have a company that didn't seek an NDA, it got one. It didn't seek this interpretation, it got it. And what Mr. Saltzman is now saying is, once that interpretation came over the transom, an interpretation not from some underling, as in OPM versus Richmond, but an official interpretation that was given after extensive consultation and extensive letters with QuestCorps, that that interpretation should have triggered the regulated entity to say, I want to make sure that you know all of the facts around it. Without Judge Pillard, the regulated entity presumably having gone to its sister agency and said, hey, what's up with this new NDA? This is for an old product. There is something that will strike fear in the hearts of every single regulated entity in the country. If it becomes incumbent on them to follow up with an agency just to make super sure that the agency hasn't made a terrible mistake. If this isn't a terrible mistake that leads to a manifest injustice of $650 odd million, I don't know what is. If there are no further questions. Thank you. Ms. Stetson, Mr. Saltzman, thank you both. The case is submitted.
judges: Tatel, Pillard, Wilkins